

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00437-CV

———————————————

IN THE INTEREST OF J.P. AND I.P., CHILDREN

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-748715-24

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

In this ultra-accelerated appeal,[1] Mother and Father each appeal the order terminating their parent–child relationships with J.P. and I.P., two of their minor children.[2]

In four issues, Mother challenges the legal and factual sufficiency supporting the trial court's findings on three conduct-based statutory termination grounds and the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). In a single issue, Father challenges the evidentiary sufficiency only as to the children's best interests. *See id.*

Because sufficient evidence supported the trial court's order, we will affirm.

## I. Background

J.P. and I.P. were born in 2022 and 2023, respectively. Mother also has two older children who did not live with her and who are not subject to this suit. Mother and Father have one younger child, B.P., who was born in 2025, still lived with Mother and Father during the final hearing in this case, and was not subject to this suit.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a)*, reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]We use initials to refer to the minors, and use relationships to the minors or fictitious names for others as necessary to protect the minors' identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

The termination petition was tried without a jury in July 2025. At the hearing, Mother, Father, a permanency specialist with Our Communities Our Kids (OCOK), an investigative supervisor with the Department of Family and Protective Services (DFPS), and Father's therapist testified.

## A.     History Before the Current Removal

The history between the family and DFPS goes back to 2017. That year, DFPS received reports that one of Mother's older children was being physically abused and that Mother had assaulted Father with a knife. When DFPS could not locate the family, the investigation was closed.

In 2021, Mother was involved in a car collision while she was intoxicated. Because Mother had children in the car with her, DFPS was called to respond, but it ultimately conducted no investigation. Father was unaware of the collision or DFPS's involvement.

In 2022, when J.P. was born, the hospital reported to DFPS that Mother had had limited prenatal care and that, although Mother's urinalysis test was negative, J.P. tested positive for methamphetamine. Because Mother was released from the hospital before the test results were returned, DFPS closed the case without removing J.P but did work

3

with the family[3] to provide services. Father was aware neither that J.P. tested positive for methamphetamine nor of DFPS's involvement.

In 2024, Mother and Father were living together in a house with Mother's ex-boyfriend. The house was under construction and lacked a kitchen or running water. Mother used methamphetamine on the property; Father moved out shortly after he quit using methamphetamine.

In March 2024, soon after Father moved out, Fort Worth Police received a domestic-disturbance call from Mother's ex-boyfriend that Mother was intoxicated on methamphetamine, had stripped herself, I.P., and J.P—then one and two years old— and was walking in the street. Mother left before the police arrived. When she came back, her ex-boyfriend again called the police, who returned and questioned Mother.

While she was speaking to them, the police saw Mother give a small glass pipe to I.P., who immediately put it in his mouth.[4] Because the pipe had methamphetamine residue on it, an officer arrested Mother for endangering a child by criminal negligence and contacted DFPS. DFPS contacted Father, who lived in Dallas at the time, to take possession of the children on condition that they not be moved back in with Mother.

---

[3]The record is unclear whether only Mother or both Mother and Father received information from DFPS about available services.

[4]Mother disputes that she gave the pipe to I.P., but not that it was her pipe, that she used it to smoke methamphetamine, or that I.P. put it in his mouth.

Shortly after taking possession, Father moved back to the house in Fort Worth with Mother and her ex-boyfriend. Father was not aware that Mother was using methamphetamine at that time, although he knew that she had been arrested. He returned to her because his living situation in Dallas was not stable and because Mother's ex-boyfriend had offered him work and had given him permission to live in the Fort Worth house. Father would later testify that he did not know that DFPS had conditioned his possession on not moving back in with Mother. When DFPS learned that he had done so, they visited the home.

The investigators found the conditions "deplorable," the home littered with debris and construction equipment and tools, lacking cooking facilities or running water, and an electrical cord running from another residence on the property as the only source of electricity to the area where Mother, Father, and the two children lived. DFPS then began the removal process.

## B.    Current Removal and Service Plans

DFPS had removed J.P. and I.P. after Mother's arrest and placed them in an adoption-focused foster home.[5] Father started working on a service plan in May 2024, but Mother did not.

---

[5]The OCOK specialist observed appropriate interactions between the foster parents and the children.

Father's service plan required him to obtain stable employment and housing and to attend parenting classes and a victim's intervention and prevention program (VIPP), obtain a drug-and-alcohol assessment and a psychological evaluation, and attend weekly individual counseling sessions. Father completed the drug-and-alcohol assessment, psychological evaluation, parenting classes, and VIPP classes and maintained employment and housing. He had no positive drug tests during the removal.

Father attended six counseling sessions over a six-month period: one in December 2024, four in January and February 2025, and one in June 2025. In his first five sessions, Father worked with his counselor on strategies to be a successful single parent because he could not co-parent with Mother. Father told his counselor in a February session that he did not believe that Mother was using methamphetamine. Father did not mention any concerns about domestic abuse or that Mother had been arrested for aggravated assault against him. Father told his counselor in these sessions that he intended to regain custody as a single parent, without Mother.

Between March 2024 and January 2025, Mother completed only one service-plan requirement: a psychological assessment. Between January and June 2025, she completed one parenting class, started a "FOCUS" parenting class but was dropped after missing two sessions, and completed a drug-and-alcohol assessment and outpatient drug-treatment program. Mother's service plan required her to abstain from criminal activity and controlled substances.

Mother and Father were both required to maintain stable housing and employment for their service plans. During the final hearing in this case, Mother, Father, and B.P. were living in a two-bedroom apartment. At the time of trial, Mother had no steady employment but could "get jobs and do them for [herself]" through friends or acquaintances in construction-related fields and cleaning. She was typically paid in cash or check. Her two older children's father also supported her. Father also worked in construction, remodeling, and roof and siding installation.

In September 2024, Mother was arrested for aggravated assault against Father after hitting him with a pole and breaking windows in the home. Father called the police "because I'm not going to wait for something really bad to happen to call them." Although Father believed that Mother was under the influence of methamphetamine when she was arrested, Mother said that she had committed the assault because she was in withdrawal. On November 13, 2024, she pleaded guilty to the offense and was placed on three years' deferred-adjudication probation.

In 2024, DFPS terminated a parental visit when Mother exposed her breast to J.P. and I.P. She explained that "in my country we breastfeed the children up until five years old[,] so we were just playing." In January 2025, DFPS terminated another visit when Mother slapped J.P.

In March 2025, at a hearing to extend the removal, Father testified that he understood that he was doing well in his services because he was not living with Mother.

The trial court agreed to extend the removal to give him additional time to complete his services.

Also in 2025, although Mother's probation prohibited her from leaving the county without notifying her probation officer and from committing any further criminal offenses, Mother was arrested for assaulting her brother-in-law in Johnson County by throwing a knife at him. Mother was living there but had not informed her probation officer that she had moved outside Tarrant County. After being released on bail, Mother moved back in with Father. Father felt that Mother had changed and would no longer present a threat to the children.

In his last counselling session in June 2025—after missing the sessions between March and May—Father informed his counselor that Mother had moved back in with him, that they were expecting a child (B.P.), that she was substance-free, and that they had stable housing and employment. Father's counselor felt that Father had not meaningfully addressed the concerns that impelled DFPS to require individual counselling.

During the final hearing, Mother also had an active warrant in Dallas County. The record does not indicate why the warrant was issued.

## C.     History of Methamphetamine Use

At trial, Mother testified that Father had introduced her to methamphetamine. Father testified that he and Mother had used methamphetamine together at their work in construction. By the time they testified at the final hearing, both Father and Mother

8

had ceased using methamphetamine. Father stopped using methamphetamine before Mother did, shortly before DFPS removed the children in 2024. Father testified both that he knew that Mother had habitually used methamphetamine for several years and that he did not know that she had used the substance while pregnant with I.P. in late 2022. Father testified that he stopped on his own and had experienced no withdrawal symptoms or urge to relapse.

Mother testified that she had used methamphetamine "like once a week or more," for "[a] little over three years." Evidencing her methamphetamine use in late 2024 while she was pregnant with B.P.,[6] Mother's February 2025 hair-follicle test admitted at trial showed a positive result for methamphetamine. The OCOK specialist testified that she had discussed Mother's continuing methamphetamine abuse with Mother and Father; Father testified that he was not aware that Mother's use continued.

Mother testified that her "relapse plan" was not to relapse and that having a plan "would be like accepting that you're going to continue using drugs, but I'm not going to. My life is going to change." She testified that she used methamphetamine in the past because she "used to work a lot," and that her job—construction, which she said was "for men"—drove her to use drugs. She then testified that she still worked in construction, demolition, roofing, siding, and cleaning.

---

[6]B.P. did not test positive at birth for methamphetamine.

9

**D.    Trial and Termination**

After hearing evidence and argument, the trial court took the matter under advisement. In September 2025, the trial court issued a final, written order terminating the parent–child relationships between Mother and Father and each child on grounds of knowingly placing or allowing the children to remain in conditions that endangered their physical or emotional well-being and engaging in conduct or knowingly placing the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, and between the children and only Mother on grounds of controlled-substance use in a manner that endangered the children's health and safety. *See* Tex. Fam. Code. Ann. § 161.001(b)(1)(D), (E), (O).[7] The trial court also found that termination was in the children's best interests. *Id.* § 161.001(b)(2).

Both Mother and Father appealed.

## II. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination—in this case DFPS—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy at least one termination ground listed in Texas Family Code Section 161.001(b)(1); and (2) that termination is in the child's best

---

[7]At the time this case was decided, this conduct-based ground was numbered as subsection (P). On September 1, 2025, the prior subsection (O) was repealed, and this ground renumbered as (O). *See* Acts 2025, 89th Leg., R.S., Ch. 211 (H.B. 116), Sec. 2, Eff. September 1, 2025 (codified at Tex. Fam. Code Ann. § 161.001(b)(1)(O)). We refer in this opinion to the former section (P).

interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In determining factual sufficiency of the evidence supporting termination of the parent–child relationship, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could

11

reasonably form a firm conviction or belief that DFPS proved the alleged termination ground and that termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder could reasonably form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

If the evidence is factually sufficient, then it is necessarily legally sufficient as well. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.).

### III. Appeal of Conduct-Based Grounds

Three of Mother's four issues challenge the legal and factual sufficiency of the evidence supporting the trial court's findings on three conduct-based grounds. Father does not challenge the trial court's conduct-based findings under Family Code section 161.001(b)(1).

### A. Conduct Grounds (D) and (E)

In her first two issues, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that she knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being or that she engaged in conduct or knowingly left the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code. Ann. § 161.001(b)(1)(D), (E).

12

We may conduct a consolidated review of findings related to termination grounds (D) and (E)—considering each parent separately—when the evidence pertaining to both grounds is interrelated, as it is here. *See In re A.B.-G.*, No. 02-19-00066-CV, 2019 WL 3755770, at *8 (Tex. App.—Fort Worth Aug. 8, 2019, pet denied) (mem. op.); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

Under termination ground (D), we examine evidence related to the children's environment to determine if that environment endangered their physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). A parent's conduct in the home, including abusive or violent conduct, can create an environment endangering the children's physical and emotional well-being. *Id.* The relevant timeframe under termination ground (D) is the period before the children were removed from the parent's care. *In re P.W.*, No. 02-24-00211-CV, 2024 WL 4293564, at *7 (Tex. App.—Fort Worth Sept. 26, 2024, no pet.) (mem. op.).

Under termination ground (E), we ask whether evidence exists that the parent's conduct—including acts, omissions, or failures to act—endangered the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Additionally, termination ground (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct. *Id.* The conduct may occur before or after the child has been removed from the parent's care, and it is not limited to the time before

13

removal. *In re O.S.*, No. 02-24-00295-CV, 2024 WL 4778360, at *8 (Tex. App.—Fort Worth Nov. 14, 2024, pet. denied) (mem. op.).

Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," it does not require that there be conduct directed at the child or that the child actually suffer injury. *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022). Evidence that a person has engaged in abusive and violent conduct in the past permits an inference that the person will continue to engage in violent behavior in the future. *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Drug and alcohol use and the effects on a parent's life and ability to parent may be endangering. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A child's positive drug test or controlled-substance ingestion may be endangering-conduct evidence. *See In re J.S.*, 675 S.W.3d 120, 129 (Tex. App.—Dallas 2023, no pet.). Likewise, a parent's mental state and failure to seek mental-health treatment may be considered in determining whether a child is endangered if the parent's mental state demonstrates an inability to provide the child with a safe and stable environment. *R.W.*, 129 S.W.3d at 739; *see In re K.G.*, 350 S.W.3d 338, 354–55 (Tex. App.—Fort Worth 2011, pet. denied).

In this case, Mother was on probation during trial for domestic-violence assault against Father. While on probation, she was also arrested for assaulting her brother-in-law in a different county, and she had an active warrant from yet a third county. *See In re H.S.*, 710 S.W.3d 248, 274 (Tex. App.—Fort Worth 2024, pets. granted)

14

("Domestic violence and a propensity for violence may . . . be considered as evidence of endangerment.").

Mother and Father had both used methamphetamine for several years before the trial in this case. Mother had no relapse plan and only a vaguely defined support network. J.P. tested positive for methamphetamine at birth. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) ("A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child.").

Mother's methamphetamine use negatively impacted the children. Mother was involved in an automobile collision while intoxicated with children in the vehicle. Mother took the children out into the street and stripped their clothing off, allegedly because she had used methamphetamine. Whether Mother actually handed the pipe to I.P. or not, it is undisputed that I.P. put Mother's pipe—which had methamphetamine residue on it—in his mouth. *See In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) ("While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm.").

Looking at all the evidence in the light most favorable to the challenged finding, the trial court could have reasonably formed a firm belief or conviction that Mother's conduct supported termination under both grounds (D) and (E). The evidence supporting these termination grounds was legally sufficient.

15

We then turn to a factual-sufficiency consideration of the entire record. Mother argues in her brief that by the trial date she had tested negative for methamphetamine, that she was living in a home with plumbing and utilities, and that her last known violent act was several months earlier. Mother cites *In re M.P.* as an analogous case. *See* 618 S.W.3d 88, 104–05 (Tex. App.—Houston [14th Dist.] 2020), *rev'd on other grounds*, 639 S.W.3d 700 (Tex. 2022). In that case, the parent used controlled substances only outside the home, and little evidence showed how that drug use caused an endangering environment to the children. *Id.* But here, Mother acknowledged that she had used drugs in the home where she lived with J.P. and I.P., J.P. tested positive for methamphetamine at birth, I.P. put a glass pipe with methamphetamine residue in his mouth, and Mother admitted to continuing to use methamphetamine while she was pregnant with her youngest child, B.P. In this case, unlike the circumstances in *In re M.P.*, factually sufficient evidence shows that Mother's methamphetamine use caused an endangering environment to J.P. and I.P. *See M.P.*, 618 S.W.3d at 105; *R.R.A.* 687 S.W.3d at 278–79.

Mother also argues that she had engaged in services during the months leading up to the trial in this case, that she has cared for B.P. since his birth, and that she ceased methamphetamine use during her pregnancy when she was last arrested for assault in late 2024. But considering these facts against the entire record, we hold that the trial court could have reasonably formed a firm conviction or belief that DFPS carried its burden under termination grounds (D) and (E). *See J.O.A.*, 283 S.W.3d at 345–46.

16

Because legally and factually sufficient evident supported the trial court's finding on these termination grounds, we overrule Mother's first and second issues.

## B. Former Conduct Ground (P)

In her third issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that she used a controlled substance in a manner that endangered the children's health or safety and either (1) failed to complete a court-ordered substance-abuse-treatment program or (2) completed a court-ordered substance-abuse-treatment program but continued to abuse a controlled substance. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

DFPS, in its brief, agrees that insufficient evidence supports the trial court's finding under this termination ground.

To affirm a parental-rights termination, we need uphold only one termination ground in addition to the best-interest finding, even if the trial court based the termination on more than one ground. *See* Tex. Fam. Code Ann. § 161.001(b); *In re N.G.*, 577 S.W.3d 230, 232–33 (Tex. 2019); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Even if we were to reverse the trial court's order as to former ground (P), our holding that legally and factually sufficient evidence supports the trial court's order as to termination grounds (D) and (E) suffices to satisfy the first statutory element. *See* Tex. Fam. Code Ann. § 161.001(b)(1).

17

## IV. The Children's Best Interest

Mother's fourth issue challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that terminating the parent–child relationship between Mother and the two children was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). Father also challenges the legal and factual sufficiency of the best-interest evidence supporting the termination of his parent–child relationships with the children. *See id.*

With proof of one or more grounds for termination, the trial court may order termination only if the factfinder also finds by clear and convincing evidence that termination is in the children's best interest. *Id.*

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). *See also H.S.*, 710 S.W.3d at 278–79. Probative conduct-ground evidence may also be probative best-interest evidence. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider evidence related to the following nonexclusive factors that the factfinder may apply in determining the children's best interest:

- the children's desires;
- the children's emotional and physical needs now and in the future;

- the emotional and physical danger to the children now and in the future;

- the custody-seeking individuals' parental abilities;

- the programs available to assist these individuals to promote the children's best interest;

- the plans for the children by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence relevant to just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

As to the children's desires, although they were infants and unable to express any preferences, the children were happy and well-adjusted in their foster placement and were well cared for. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th

Dist.] 2014, no pet.) (citing *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.).

As to (1) the children's physical needs now and in the future, (2) the physical and emotional danger to the children now and in the future, and (3) the programs available to assist the parents in promoting the children's best interests, when J.P. and I.P. lived with Mother and Father, they were living in a house with no kitchen or running water. Mother was regularly using methamphetamine in the home and, when the children were removed, was walking unclothed in the street with them. Mother's history includes domestic violence against Father, and both parents' history includes methamphetamine use. J.P. tested positive for methamphetamine at birth. Neither Mother nor Father had an articulable relapse plan, and both showed unwillingness to participate in programs to assist them in promoting the children's best interests. *See J.T.G.*, 121 S.W.3d 125–26 ("Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct as well."); *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (stating that evidence of endangerment is relevant to a best-interest determination).

Mother had allegedly threatened Father with a knife, had hit him with a pole, had broken windows in their home, and had been arrested for assaulting her brother-in-law (with whom they still lived at that time). But she refused to attend anger-management classes or other therapy. Father moved back in with Mother to "deplorable" conditions and again while she was on probation for assaulting him after she was released from jail

20

after assaulting her brother-in-law. *See In re R.R.*, 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.) (holding that exposure to domestic violence is relevant when considering child's best interest).

As to (1) the parents' parenting abilities, (2) parental acts indicating that the existing parent–child relationship is not a proper one, and (3) the parents' excuses for their behavior, the record shows that neither parent completed his or her service plan; Mother had several issues in interacting with the children during her visits, having exposed her breast to them and hit J.P.; Mother minimized these issues, saying that flashing breasts at children was normal behavior; and neither parent accepted responsibility for the acts that had exposed their children to methamphetamine and domestic violence. Although both parents admitted to illegal drug use, neither had a firm sobriety date, relapse plan, or support system. Father testified that he knew of no issues with Mother's behavior—although some of the behavior was assault against him—or prior DFPS involvement and testified that he simply did not understand that his possession of the children was contingent upon his not returning to Mother.

As to the plan for the children, the parents did not articulate a plan for the future other than to move the children into their two-bedroom apartment. Conversely, the foster placement was adoption-focused.

Father argues that any danger he and Mother presented was mitigated through his actions after the children's removal, with his having substantially completed services requested by DFPS, and the methamphetamine-negative test result at B.P.'s birth. He

also argues that he and Mother had obtained stable housing before final trial and that he had stable employment, consistently passed drug tests, and did "everything requested by DFPS."

Mother argues that her completing some services in the months since B.P.'s birth indicates that termination is not in the other children's best interests.

Although both parents cite some improvement, the trial court was entitled to conclude that their past conduct weighed in favor of terminating Mother's and Father's parental rights. *See J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) ("[I]t is proper to measure a parent's future conduct by his or her past conduct to determine whether termination is in the child's best interest."); *In re S.A.W.*, 131 S.W.3d 704, 709 (Tex. App.—Dallas 2004, no pet.) (holding termination to be in child's best interest despite mother's lifestyle improvements and eventual compliance with service plan); *In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that a parent's "recent turnaround" and compliance with a service plan are factors that should be considered when determining best interest but are not solely determinative).

Most of the *Holley* factors weigh in favor of terminating the parents' rights to the children. Adhering to the applicable standards of review, we hold that the evidence was both legally and factually sufficient for the trial court to have formed a firm belief or

22

conviction that terminating both Mother's and Father's parental rights to J.P. and I.P. was in the children's best interest. Having held that the evidence is legally and factually sufficient to support the trial court's best-interest findings, we overrule Mother's final issue and Father's only issue.

## V. Conclusion

Having overruled all issues necessary to our disposition, we affirm the trial court's judgment terminating Mother's and Father's parental rights to J.P. and I.P.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: February 12, 2026